**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

VENTRON MANAGEMENT, LLC,

    *Plaintiff*,

vs.                                              CASE NO. _____

TOKIO MARINE SPECIALTY
INSURANCE COMPANY; AMERICAN
GUARANTEE & LIABILITY INSURANCE
COMPANY,

    *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Ventron Management LLC ("Ventron") sues Tokio Marine Specialty Insurance Company ("Tokio Marine") and American Guarantee & Liability Insurance Company ("Zurich") as follows:

### NATURE OF ACTION

1.    This is an action for declaratory relief and damages, pursuant to 28 U.S.C. §§ 2201 and 2202, arising out of the refusal of Defendants' refusal to unconditionally indemnify and defend Ventron in an underlying lawsuit alleging bodily injury arising out of Ventron's alleged failure to properly manage and secure the subject property.

### PARTIES, JURISDICTION AND VENUE

2.    At all material times, Ventron was and is a Florida limited liability company with its principal place of business in Boca Raton, Florida. Ventron at all material times transacted business in Boca Raton, Florida. Ventron's sole member is Ronald Eisenberg, who is domiciled in and is a citizen of Florida.

3. Upon informed belief, at all material times, Tokio Marine was and is a Delaware corporation with its principal place of business in Wilmington, Delaware. Tokio Marine is an insurance company authorized by the Florida Department of Financial Services to issue insurance policies in Florida and does business in the State of Florida.

4. Upon informed belief, at all material times, Zurich was and is a New York corporation with its principal place of business in New York, New York. Zurich is an insurance company authorized by the Florida Department of Financial Services to issue insurance policies in Florida and does business in the State of Florida.

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), as the Parties' respective states of incorporation and principal places of business are diverse, thus establishing diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because the insurance policies described below were all issued for delivery and delivered to Ventron in this District; the causes of action accrued in this District; Ventron's principal place of business is in this District; Tokio Marine and Zurich conduct business in this District; and a substantial part of the events or omissions giving rise to the claims under the subject policies occurred in this District.

## THE POLICIES

### THE TOKIO MARINE PRIMARY POLICY

7. Tokio Marine issued a commercial general liability policy to Ventron bearing Policy No. PPK1627384 and covering the time period of March 19, 2017 to March 19, 2018 (the "Tokio Marine Policy"). A copy of the Tokio Marine Policy is attached as **Exhibit A**.

8. The Tokio Marine Policy was issued for delivery to and delivered to Ventron in

Boca Raton, Florida.

9. Ventron paid the full premiums on the Tokio Marine Policy and satisfied all other conditions to maintain the Tokio Marine Policy in full force and effect at all relevant times.

**Coverage A – Bodily Injury and Property Damage Liability**

10. The Tokio Marine Policy is subject to a $1,000,000.00 per-"occurrence" limit for losses covered under "Coverage A – Bodily Injury and Property Damage Liability" ("Coverage A") and a $2,000,000.00 general aggregate limit where two or more "occurrences" give rise to covered damages during the policy period. **Ex. A** at Declarations.

11. Under Coverage A of the Tokio Marine Policy, defense expenses are paid outside of and in addition to the applicable policy limits. *Id.* at Section III – Supplementary Payments – Coverages A and B.

12. The Tokio Marine Policy obligates Tokio Marine to "pay those sums that the insured becomes legally obligated to pay as damages because of … **bodily injury** …" occurring "during the policy period" and "caused by an **occurrence**" and to "defend the insured against any **suit** seeking those damages." *Id.* at Section I – Coverages, Coverage A – Bodily Injury and Property Damage Liability.

13. Under Coverage A, Tokio Marine's duty to defend "ends when [Tokio Marine] has used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B." *Id.*

14. The Tokio Marine Policy defines "Bodily Injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time" *Id.* at Section V – Definitions, ¶ 3.

15. The Tokio Marine Policy defines "Occurrence" to mean "an accident, including

continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at Section V – Definitions, ¶ 13.

**Assault and Battery Sublimit Endorsement**

16. The Tokio Marine Policy is also subject to a $1,000,00.00 per-claim and aggregate "Assault and Battery Sublimit," which states that Tokio Marine:

> [W]ill pay those sums that the insured becomes legally obligated to pay as damages because of "injury" to which the LIQUOR LIABILITY COVERAGE FORM applies; and to "**bodily injury**," "**property damage**," or "**personal and advertising injury**" to which the COMMERCIAL GENERAL LIABILITY COVERAGE FORM applies, resulting from assault and/or battery only, as described below.
>
>    A. Assault and/or battery committed by any person;
>    B. The failure to suppress or prevent assault and/or battery by any person;
>    C. The failure to provide an environment safe from assault and/or battery or failure to warn of the dangers of the environment which could contribute to assault and/or battery;
>    D. The negligent hiring, supervision, or training of any person that results in assault and/or battery;
>    E. The use of any force to protect persons or property whether or not the "injury," "bodily injury" or "property damage" was intended from the standpoint of the insured or committed by or at the direction of the insured; and
>    F. "Personal and advertising injury" caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

**Ex. A** at Endorsement Form No. PIC-GLN-003(10/12) (the "Sublimit Endorsement").

17. Under its plain language, with respect to claims and lawsuits subject to the COMMERCIAL GENERAL LIABILITY COVERAGE FORM, the Sublimit Endorsement applies solely to claims and lawsuits alleging "bodily injury," "property damage," or "personal and advertising injury" resulting from "assault and/or battery **only**." *Id.*

18. Under its plain language, where the subject claim or lawsuit alleges "bodily injury,"

"property damage," or "personal and advertising injury" resulting in whole or part from something other than "assault and/or battery," the Sublimit Endorsement is inapplicable. *Id.*

19. The Tokio Marine Policy does not define the terms "assault," "battery," or "assault and/or battery" as used in the Sublimit Endorsement.

20. The Sublimit Endorsement further states that Tokio Marine "will have the right and duty to defend [Ventron] against any 'suit' seeking those damages" and that such "right and duty to defend ends when [Tokio Marine] ha[s] used up the applicable sublimits of insurance shown in the endorsement SCHEDULE, in the payment of judgments or settlements or expenses for the coverage provided by this endorsement." *Id.*

21. Where a claim for "bodily injury" is subject to the Sublimit Endorsement, Tokio Marine's payment of settlements, judgments and "expenses for the coverage" reduces the applicable $1,000,000.00 sublimit. *Id.*

**Designated Location(s) General Aggregate Limit**

22. The Tokio Marine Policy, as amended by endorsement, states that "[f]or all sums which the insured becomes legally obligated to pay as damages caused by 'occurrences' under Section I – Coverage A … which can be attributed only to operations at a single designated 'location' shown in the Schedule above: a separate Designated Location General Aggregate Limit applies to each designated 'location' and that limit is equal to [$2,000,000.00]." **Ex. A** at Form CG 25 04 05 09, ¶ A.1.

23. The Tokio Marine Policy confirms that "[a]ny payments made under Coverage A for damages … shall reduce the Designated Location General Aggregate Limit for that designated 'location'. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Location General Aggregate Limit for any other

designated 'location' shown in the Schedule above." *Id.* at ¶ A.3.

24. The Tokio Marine Policy further confirms that "[t]he limits shown in the Declarations for Each Occurrence [$1,000,000.00] … continue to apply[;] [h]owever, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Location General Aggregate Limit." *Id.* at ¶ A.4.

25. For purposes of the Designated Location General Aggregate Limit Endorsement, the Tokio Marine Policy defines "location" to mean "premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad." *Id.* at ¶ E.

26. The Tokio Marine Policy Schedule of "Locations" includes 1023 Seasons Parkway, Norcross, Georgia 30093-3126 (the "Las Palmas Apartments"). **Ex. A** at Schedule of Locations.

27. The Tokio Marine Policy Schedule of "Locations" includes 500 Maxham Road, Austell, Georgia 30168-1805 (the "Birch Landing Apartments"). **Ex. A** at Schedule of Locations.

28. The incident giving rise to the Las Palmas Lawsuit described below is attributable solely to operations at the Las Palmas Apartments (no other location) and was the first and only "occurrence" attributed to this location during the March 19, 2017 to March 19, 2018 Tokio Marine Policy period.

### THE ZURICH EXCESS POLICY

29. Zurich issued a Straight Excess Liability Policy to Ventron bearing Policy No. SXS 0122832-00 for the March 19, 2017 to March 19, 2018 policy period (the "Zurich Policy"). A copy of the Zurich Excess Policy is attached as **Exhibit B**.

30. The Zurich Policy was issued for delivery and delivered to Ventron in Boca Raton, Florida.

31. Ventron paid the full premiums on the Zurich Policy and satisfied all other conditions to maintain the Zurich Excess Policy in full force and effect at all relevant times.

32. The Zurich Policy is subject to a $25,000,000.00 per-occurrence and aggregate limit of liability. **Ex. B** at Declarations.

33. The Zurich Policy obligates Zurich to "pay on behalf of [Ventron] those damages covered by [the Zurich Policy] in excess of the total Applicable Limits of **underlying insurance**." **Ex. B** at Section I. Coverage, ¶ A.

34. Under the Zurich Policy, "[c]overage applies only in excess of the greater of the actual limits of insurance of **underlying insurance** or the Applicable Limits of insurance shown in the Schedule of Underlying Insurance forming a part of this policy." *Id.* at p. 2 of 10.

35. Under the Zurich Policy, "**underlying insurance**" means, in relevant part, the Tokio Marine Policy. *Id..* at Section VII. Definitions, ¶ G and Schedule of Underlying Insurance.

36. The Zurich Policy states that "[i]f the limits of [the Tokio Marine Policy] have been reduced solely by payment of **loss** for which coverage is afforded under this policy, this policy will drop down to become immediately excess of the reduced underlying limit." *Id.* at p. 2 of 10.

37. The Zurich Policy also states that "[i]f the limits of [the Tokio Marine Policy] have been exhausted solely by payment of **loss** for which coverage is afforded under this policy, this policy will continue in force as **underlying insurance**." *Id.*

38. The Zurich Policy also obligates Zurich to "assume control of the investigation and settlement of any claim, or defense of any suit against the insured for damages covered by this policy when the applicable limit of the [Tokio Marine Policy] and **other insurance** has been exhausted by payment of **loss** for which coverage is afforded under this policy. **Ex. B** at Section III. Defense and Supplementary Payments, ¶ A.

39. The Zurich Policy also obligates Zurich, "[i]n those circumstances where Paragraph A above applies, … [to] pay [Zurich's] expenses and the following to the extent they are not included in [the Tokio Marine Policy]: … [r]easonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or suit, including actual loss of earnings because of time off from work[;] [a]ll court costs taxed against the insured in the suit….[;] pre-judgment interest"; and post-judgment interest. *Id.* at ¶ B. When these "expenses and the payments described in this paragraph … are not included in the definition of **loss**, they will not reduce the Limits of Insurance" under the Zurich Policy. *Id.*

40. The Zurich Policy states that "[i]n those circumstances where Paragraph A above does not apply, [Zurich] do[es] not have the duty to assume control of the investigation and settlement of the claim, or defense of any suit against the insured," but does "have the right to participate in the investigation and settlement of any claim, or defense of any suit that we feel may create liability on our part under the terms of the policy." *Id.* at ¶ C.

41. If Zurich exercises a right to "participate in the … defense of any suit that [Zurich] feels may create liability on [Zurich's] part under the terms of [the Zurich Policy]," Zurich is obligated to "do so at [its own] expense." *Id.*

42. The Zurich Policy states that it "does not apply to any liability, damage **loss**, cost or expense … [w]hich is covered by an **underlying insurance** but is subject to a sublimit unless such sublimited coverage is specifically endorsed to this policy." *Id.* at Section IV. Exclusions, ¶ D.

43. The Zurich Policy defines "**loss**" to mean "those sums actually paid that the insured is legally obligated to pay as damages for the settlement or satisfaction of a claim because of injury or offense after making proper deductions for all recoveries and salvage" including "defense

expenses and supplementary payments if **underlying insurance** includes defense expenses and supplementary payments in the Limits of Insurance." Loss does not include "defense expenses and supplementary payments if **underlying insurance** does not include defense expenses and supplementary payments in the Limits of Insurance." *Id.* at Section VII. Definitions, ¶ C.

## THE UNDERLYING LAWSUITS AND THE CARRIERS' RESPONSE

### Las Palmas Incident and Resulting Lawsuit

44. At all material times, Ventron managed the Las Palmas Apartments and the Birch Landing Apartments.

45. On or about April 30, 2017, Ventron received notice that a 17-year-old resident of the Las Palmas Apartments ("A.G."[1]) alleged that on April 13, 2017, a stranger entered her locked apartment without force and sexually assaulted her at gunpoint (the "Las Palmas Incident").

46. Tokio Marine and Zurich were timely notified of the Las Palmas Incident.

47. On or about March 3, 2018, the son of a resident of the Birch Landing Apartments was shot and killed on Birch Landing Apartment property (the "Birch Landing Incident").

48. Tokio Marine and Zurich were timely notified of the Birch Landing Incident.

49. On March 18, 2018, A.G. sued Ventron alleging that Ventron's failure to properly manage and secure the Las Palmas Apartments was a cause of the Las Palmas Incident and A.G.'s injuries (the "Las Palmas Lawsuit"). Copies of the original and first amended complaints in the Las Palmas Lawsuit are attached as **Exhibits C** and **D**, respectively.

50. The Las Palmas Lawsuit alleges, among other things, that:
   - "[A]n unidentified male intruder defeated the deadbolt lock, entered the apartment through the front door, and walked into [A.G's] bedroom… and

---

[1] The resident's name has been omitted from this filing to preserve the resident's privacy.

raped [A.G].” **Ex. D** at ¶ 13.

- “As a direct and proximate result of this incident, [A.G] suffered physical injury, humiliation, fright, anxiety, and mental anguish” **Ex. D** at ¶ 13.

- “Prior to and on April 13, 2017, the subject premises was negligently maintained, inspected, secured, patrolled, and managed. Defendants had knowledge, both actual and constructive, of the need to properly maintain, secure, inspect, patrol, and manage said premises, but failed to exercise ordinary care.” **Ex. D** at ¶ 15.

- “Defendants negligently failed to implement policies or follow their own policies regarding key control, thereby causing an unreasonable risk of apartment break-ins and injury to their residents, including [A.G]. Defendants' negligent failure to follow a proper key control policy, coupled with the evidence indicating the perpetrator entered with a key, proximately caused Plaintiff's damages.” **Ex. D** at ¶ 18a.

- “Defendants were negligent and said negligence proximately caused Plaintiff's injuries in the following ways, to wit: (a) [F]ailing to use ordinary care to keep the premise safe; (b) Violation of O.C.G.A. 44-7-13; (c) [F]ailing to properly inspect and maintain the premises; (d) [F]ailing to warn of the latent dangers on the premises; (e) [F]ailing to properly train and supervise employees in regard to the maintenance and safety of said premises; (f) [F]ailing to properly retain, entrust, hire, train, and supervise said employees; (g) [F]ailing to inspect, patrol, or appropriately monitor the premises; and (h) [F]ailing to employ proper security measures in light of the history of the property and high-crime area in

which the property is located." **Ex. D** at ¶ 26.

51. The Las Palmas Lawsuit seeks "to recover for the injuries and pain and suffering proximately caused by Defendants' [alleged] negligence … including, but not limited to the following…: (a) Personal and physical injuries; (b) Past, present and future pain and suffering; (c) Past, present and future lost wages; (d) Past, present and future medical expenses; (e) Permanent injuries; (f) Mental anguish, disability, and emotional distress; (g) Loss of the capacity for the enjoyment of life; (h) Impaired ability to labor; (i) Incidental expenses; (j) Consequential damages to be proven at trial; and (k) All items of damages recoverable…." **Ex. D** at ¶ 32.

52. Tokio Marine and Zurich were timely notified of the Las Palmas Lawsuit.

53. On or about April 5, 2018, Tokio Marine retained Brynda Insley, Jim Myers, and Wayne Cartwright of the law firm of Insley & Race LLC to defend Ventron in the Las Palmas Lawsuit.

54. Although the Tokio Marine Policy had not yet exhausted its policy limits, Zurich elected to participate in the investigation and defense of the Las Palmas Lawsuit.

55. On June 18, 2018, the wife and estate of the victim of the Birch Landing Incident sued Ventron alleging that Ventron's failure to properly manage and secure the Birch Landing Apartments was a cause of the Birch Landing Incident (the "Birch Landing Lawsuit").  A copy of the complaint in the Birch Landing Lawsuit is attached as **Exhibit E.**

56. On or about July 11, 2018, Tokio Marine retained the law firm of Carlock, Copeland & Stair LLP to defend Ventron in the Birch Landing Lawsuit.

57. On or about February 25, 2019, Ventron's defense counsel in the Birch Landing Lawsuit provided Tokio Marine and Zurich with its assessment of Ventron's exposure in the Birch Landing Lawsuit in anticipation of an upcoming June 3, 2019 mediation.

58. Upon informed belief, on April 10, 2019, Tokio Marine wrote to Ventron and Zurich stating that in light of the ongoing settlement discussions in the Birch Landing Lawsuit, there was the potential that Tokio Marine would be paying what it believed was the remainder of its $1,000,000.00 applicable policy limit under the Sublimit Endorsement and that Ventron would have to look to its excess carriers, including Zurich, for defense and indemnity in the remaining claims, including the Las Palmas Lawsuit.  Specifically, Tokio Marine's April 10, 2019 letter stated:

> I am writing to put you on notice that the potential for an exhaustion of certain policy limits may be imminent, and that if and when that occurs, Tokio [Marine] will no longer have a duty to defend certain remaining claims that fall under the relevant policy provisions and will withdraw its defense of those claims. If and when that happens, Ventron will need to either assume the defense or tender the defense to its excess providers that provide coverage for such claims.

59. On or about May 4, 2019, Zurich agreed to assume Ventron's defense unequivocally and without reservation, confirming that "with the exhaustion of the primary policy expected by the [Birch Landing Lawsuit] … Zurich [is] soon to be … dollar one on defense and indemnity" in the Las Palmas Lawsuit.  A copy of Zurich's May 4, 2019 correspondence accepting defense and indemnity of the Las Palmas Lawsuit without reservation is attached as **Exhibit F**.

60. Zurich also informed Ventron that Zurich was unhappy with Ventron's current Tokio-Marine-appointed defense counsel in the Las Palmas Lawsuit and therefore planned to replace them with a firm of its own choosing. *Id.*

61. Ventron objected to Zurich replacing Ventron's defense counsel in the Las Palmas Lawsuit who, at the time, had been defending Ventron since shortly after the lawsuit's inception nearly fifteen months earlier.

62. Zurich nonetheless retained Hawkins, Parnell & Young LLP to replace Ventron's then-existing defense counsel in the Las Palmas Lawsuit over Ventron's objection. *Id.*

- 12 -

US_ACTIVE-151677435.1-393608-60003

63. In light of Zurich's unreserved agreement to defend and indemnify Ventron in the Las Palmas Lawsuit, Ventron did not further object to Zurich's appointment of Zurich's choice of defense counsel and allowed Zurich to control Ventron's defense.

64. In the interim, Zurich's settlement negotiations with the plaintiff in the Birch Landing Lawsuit continued.

65. Upon information and belief, Zurich, unhappy with the assessment provided by Ventron's Tokio-Marine-appointed defense counsel in the Birch Landing Lawsuit and already having received confirmation that Tokio Marine would tender the remainder of what Tokio Marine and Zurich believed to be the applicable Tokio Marine Policy limit under the Sublimit Endorsement, cut Ventron's defense counsel out of settlement negotiations with counsel for the plaintiff in the Birch Landing Lawsuit and initiated settlement negotiations directly with plaintiff's counsel.

66. Zurich's settlement negotiations ultimately culminated in a settlement of the Birch Landing Lawsuit.

67. The terms of Birch Landing settlement are, at least in part, confidential, but are known in full to both Tokio Marine and Zurich.

68. At no time did Zurich or Tokio Marine reserve any rights with respect to the settlement of the Birch Landing Lawsuit.

69. Zurich continued to control all aspects of Ventron's investigation, defense, and settlement of the Las Palmas matter until February 4, 2020 – four days after the close of discovery and on the eve of mediation in the Las Palmas Lawsuit – when Zurich for the first time informed Ventron that "coverage is barred for the [Las Palmas Lawsuit] under the [Zurich Policy]" for the reasons stated in enclosed Zurich's January 27, 2020 letter concerning another matter. A copy of

Zurich's February 4, 2020 denial letter is attached as **Exhibit G** and a copy of Zurich's incorporated January 27, 2020 letter is separately attached as **Exhibit H**.

70. The principal basis for Zurich's denial was that "[c]overage is barred under the [Zurich Policy's] "Sublimited Underlying Insurance" exclusion because Tokio's "Assault and Battery Sublimit" was not endorsed on the [Zurich Policy]" and "since Tokio advises that its primary policy does not afford coverage for 'assault and battery' claims other than under the Sublimit endorsement, and the [Zurich Policy] follows form to the Tokio primary policy, there is no coverage…." **Ex. H** at pp. 1-6.

71. Prior to February 4, 3020, Zurich paid substantial amounts under the Zurich Policy in excess of what Tokio Marine and Zurich believe to be Tokio Marine's applicable $1,000,000.00 limits under the Tokio Marine Sublimit Endorsement toward claim(s) alleging assault and/or battery that Zurich contends fall within the Tokio Marine Sublimit Endorsement.[2]

72. There is no principal difference between the circumstances of those claims alleging assault and/or battery toward which Zurich has paid defense and/or indemnity expenses under the Zurich Policy and the Las Palmas Lawsuit that would legally or equitably justify Zurich's inconsistent and belated coverage positions.

73. Zurich's February 4, 2020 letter stated that "Ventron needs to make timely arrangements to take over the defense and handling of the [Las Palmas Lawsuit] … by no later than Friday, February 28, 2020," recommended that "Ventron maintain [Zurich's choice of Hawkins, Parnell & Young] as defense counsel to resolution of the case given the cases' procedural

---

[2] In compliance with the confidentiality provisions of certain agreements, the identities of those claims and the amounts of Zurich's payment are not expressly set forth in this pleading. Those facts are directly relevant to the parties' disputes, however, and the proper procedure for handling that information will be addressed with the Court if the parties are unable to agree on an appropriate protocol.

posture," and suggested that Zurich and Ventron "plan to address defense costs previously paid by Zurich after the transition is completed." **Ex. G** at p. 1.

74. Zurich has not reserved its right to seek reimbursement of defense costs in relation to the Las Palmas Lawsuit, and no such right is provided by the Zurich policy or under applicable law.

75. On February 18, 2020, plaintiff in the Las Palmas Lawsuit issued a policy-limits settlement demand to Zurich, which was forwarded to Zurich for coverage. As of the date of this complaint, Zurich has not agreed to make any part of its remaining limits available to settle the Las Palmas Lawsuit on Ventron's behalf in response to the plaintiff's February 18, 2020 demand.

76. Ventron has retained the undersigned counsel to represent it in this action, and has agreed to pay counsel a reasonable fee for services rendered.

## COUNT I: DECLARATORY RELIEF - ZURICH

77. Ventron re-alleges paragraphs 1 through 76 as if fully set forth herein.

78. Ventron made timely payment of all premiums and otherwise satisfied all conditions precedent for coverage under the Zurich Policy.

79. The Zurich Policy constitutes a valid and enforceable contract under the laws of the State of Florida.

80. The Zurich Policy, as a follow form excess policy, requires Zurich to defend and indemnify Ventron against third-party claims seeking damages in excess of the applicable Tokio Marine Policy limit because of "bodily injury" occurring "during the policy period" which is "caused by an occurrence".

81. The plaintiff in the Las Palmas Lawsuit seeks to hold Ventron liable for damages in excess of the Tokio Marine Policy's general aggregate limit and alleges that those damages are

because of "bodily injury" occurring during the policy period, caused by an "occurrence."

82. No exclusions, including exclusions identified in **Exhibit B** attached hereto, apply under the circumstances to relieve Zurich of its duties to defend and indemnify Ventron in relation to the Las Palmas Lawsuit.

83. Regardless, Zurich has waived its right to deny coverage, withdraw from Ventron's defense and seek recoupment of defense expenses paid to date and/or is estopped from doing so due to Zurich's acts and omissions in connection with, *inter alia*, the Birch Landing Lawsuit and Las Palmas Lawsuit, including, without limitation:

> a. Zurich's agreement to pay amounts under the Zurich Policy on Ventron's behalf to settle claim(s) alleging assault and/or battery despite taking the position that those claim(s) like (as Zurich believes) the Las Palmas Lawsuit, fall within Tokio Marine's "Assault and Battery" Sublimit Endorsement;
>
> b. Zurich's agreement to assume "dollar one" defense and indemnity obligations for the Las Palmas Lawsuit in anticipation of and following the resolution of the Birch Landing Lawsuit without reserving a right to later deny coverage or recover defense expenses or otherwise informing Ventron of Zurich's position on the potential application of Zurich's "Sublimited Underlying Insurance" Exclusion; and
>
> c. Zurich's assumption of complete control over Ventron's defense of the Las Palmas Lawsuit, including its unilateral replacement of Ventron's existing defense counsel, for seven months prior to denying coverage and withdrawing from Ventron's defense at the close of discovery and on the eve of mediation.

84. Zurich is therefore obligated to defend and indemnify Ventron with respect to the

Las Palmas Lawsuit, but continues to disagree with Ventron's position and maintains its right to deny coverage under the Zurich Policy.

85. Specifically, Zurich and Ventron disagree as to:

a. Whether and to what extent Zurich's "Sublimited Underlying Insurance" Exclusion precludes coverage for the Las Palmas Lawsuit;

b. Whether and to what extent Zurich has waived the right to deny a defense and indemnity to Ventron in the Las Palmas Lawsuit;

c. Whether and to what extent Zurich is estopped from denying a defense and indemnity to Ventron in the Las Palmas Lawsuit;

d. Even if Zurich properly denied coverage for the Las Palmas Lawsuit, whether and to what extent Zurich is entitled to seek reimbursement from Ventron for defense expenses paid by Zurich to defend Ventron in the Las Palmas Lawsuit (including whether and to what extent Zurich as waived or is estopped from asserting a right to reimbursement).

86. Accordingly, an actual and justiciable controversy exists between Zurich and Ventron for which a declaratory judgment setting forth their respective rights and obligations under the Zurich Policy in relation the Las Palmas Lawsuit is necessary and appropriate.

**COUNT II:  DECLARATORY RELIEF – TOKIO MARINE**

87. Ventron re-alleges paragraphs 1 through 76 as if fully set forth herein.

88. This count against Tokio Marine is pled in the alternative to the count for declaratory relief against Zurich.

89. Ventron made timely payment of all premiums and otherwise satisfied all conditions precedent for coverage under the Tokio Marine Policy.

90. The Tokio Marine Policy constitutes a valid and enforceable contract under the

laws of the State of Florida.

91.     The Tokio Marine Policy requires Tokio Marine to defend and indemnify Ventron against third-party claims seeking damages because of "bodily injury" occurring "during the policy period" which is "caused by an occurrence."

92.     The Las Palmas Lawsuit alleges damages because of "bodily injury" occurring during the policy period, caused by an "occurrence."

93.     No exclusions, including exclusions identified in **Exhibit A** attached hereto, apply under the circumstances to relieve Tokio Marine of its duties to defend and indemnify Ventron in relation to the Las Palmas Lawsuit.

94.     Tokio Marine has (like Zurich) asserted that because Tokio Marine has paid $1,000,000.00 to defend and indemnify Ventron against claims alleging, among other things, assault and/or battery occurring during the Tokio Marine Policy period on property managed by Ventron, Tokio Marine owes no further duty to defend or indemnify Ventron in the Las Palmas Lawsuit.

95.     Ventron disagrees that Tokio Marine has exhausted its applicable policy limits because, among other reasons:

    a.     Tokio Marine's Sublimit Endorsement by its terms applies only to claims alleging "bodily injury" "resulting from assault and/or battery only" and where, as here, a lawsuit alleges "bodily injury" resulting in whole or part from something other than "assault and/or battery," the Sublimit Endorsement is inapplicable; and

    b.     Even if Tokio Marine did pay the remainder of its applicable policy limit under the Sublimit Endorsement to resolve other claims alleging assault and/or battery, the Tokio Marine Policy's Designated Location(s) General Aggregate Limit states that a

separate aggregate limit applies to each "location" listed on the policy's Schedule of Locations, including the Las Palmas Apartments, and Tokio Marine has not exhausted that per-location limit with respect to the Las Palmas Apartments.

96. Accordingly, an actual and justiciable controversy exists among the parties as to which a declaratory judgment setting forth their respective rights and obligations under the Tokio Marine Policy in relation to the Las Palmas Lawsuit is necessary and appropriate.

**WHEREFORE**, Ventron Management LLC prays for entry of judgment:

(1) declaring the rights and interests of the parties in the issues and for the reasons described above;

(2) if necessary to provide full relief, awarding damages to Ventron to the extent it has paid or agreed to pay any sums which should be borne by some or all of the insurers, including interest on such sums as provided by law;

(3) legal fees and costs incurred in bringing this action pursuant to Sections 627.428 and/or 626.9373, Florida Statutes, and;

(4) such other and further relief as may be equitable, just, and proper.

## TRIAL BY JURY

Ventron demands a trial by jury of all issues so triable as a matter of right.

Dated this 21st day of February, 2020.

Respectfully submitted,

**REED SMITH LLP**
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
Telephone: (786) 747-0200
Fax: (786) 747-0299

*/s/ Matthew B. Weaver*
**R. Hugh Lumpkin**
Florida Bar No. 308196

- 20 -

        hlumpkin@reedsmith.com
        **Matthew B. Weaver**
        Florida Bar No. 42858
        mweaver@reedsmith.com
        **Christopher T. Kuleba**
        Florida Bar No. 105302
        ckuleba@reedsmith.com

        *Counsel for Plaintiff*